### United States District Court
### District of Massachusetts

|  |  |
|---|---|
| _____ ) | |
| Brotherhood of Maintenance of Way ) | |
| Employees, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 23-10587-NMG |
| ) | |
| Keolis Commuter Services, LLC, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises out of an arbitration between a railway carrier and a labor union.  The Brotherhood of Maintenance of Way Employees Division of the International Brotherhood of Teamsters ("BMWED" or "plaintiff"), seeks to enforce an arbitral Award against Keolis Commuter Services, LLC ("Keolis" or "defendant") made under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq.  Pending before the Court is Keolis's motion to dismiss (Docket No. 15).  For the reasons that follow, the motion will be ALLOWED, in part, and DENIED, in part.

### I.  **Background**

In 2019, Keolis, a "carrier" under the RLA, and BMWED, a "representative" thereunder, entered into a Memorandum of Agreement ("MOA").  The MOA establishes wages, benefits and

other working conditions for Keolis employees who are BMWED members.  It also contains a "Me-Too" provision which, according to BMWED, requires Keolis to match certain more favorable terms of future agreements with other bargaining units.

From December 2019 to March 2020, Keolis entered into subsequent agreements with three other unions, the American Train Dispatchers Association ("ATDA"), the International Brotherhood of Electrical Workers ("IBEW") and the Brotherhood of Railroad Signalmen ("BRS") that purportedly contained higher wage provisions.  Keolis and BMWED disagreed about the meaning and application of the Me-Too provision with respect to the three subsequent agreements.  Under the RLA, the dispute was to be resolved through binding arbitration and in March, 2021, the parties agreed to adjudication before a "Special Board of Adjustment" ("SBA").

The SBA issued its award ("the Award") in October, 2021 and interpreted the MOA to require that:

> 1. The Carrier shall "extend", and therefore, provide the Organization with the opportunity to review the option of accepting the general wage increase provided in the subsequent agreements in a manner that addresses the cost of the increased wages as it relates to the "economic value negotiated by Keolis and the BMWED for the contract terms commencing July 1, 2016 through June 30, 2022".
>
> 2. Upon such discussion, the Organization will have the opportunity to accept the general wage increase within the economic value ascribed to the existing MOA.

> 3. Where upon the discussions between the parties it
> is established that the subsequent agreements
> contained a greater "economic value negotiated by
> Keolis and the BMWED for the contract terms commencing
> July 1, 2016 through June 30, 2022", the Claimants
> shall be entitled to a general wage increase equal to
> the additional value, if any, of a subsequent
> agreement.

The SBA held that Keolis must afford BMWED the opportunity to

"consider the same benefit" it extended to other unions in

subsequent agreements.  It also found, however, that the Me-Too

provision is not self-executing and requires evidence that "an

assessment can be made of the economic value" of the general

wage increase in the subsequent agreements when compared to the

economic value of changes made to the MOA.

In November, 2021 and January, 2022, Keolis provided BMWED

with proposals that purported to afford BMWED the opportunity to

accept the general wage adjustment made in the ATDA agreement

"as it related to the economic value of the MOA."  The January,

2022 letter also included a cost summary which, according to

Keolis, compares the total cost of the MOA with the total cost

of the ATDA agreement.  BMWED avers that the cost summary

compares BMWED's 2019 contract to Keolis' new proposal "but not

to the economic value of the other unions' agreements."

In April, 2022, the parties conferred once more and were

unable to reach a resolution.  BMWED asserted that Keolis did

not provide the requisite information needed to establish

whether the MOA had a greater economic value than the subsequent agreements with other unions.

After another exchange of correspondence, Keolis made clear its position that the issue was closed while BMWED contended that Keolis failed to comply with the Award.  Thereafter, BMWED filed the instant petition to enforce the Award under 45 U.S.C. § 153 First (p).  In its petition, BMWED seeks an order compelling Keolis 1) to discuss and provide sufficient information to enable the parties to determine the total economic value of the MOA vis-à-vis the economic value of the subsequent agreements with other unions and 2) to negotiate in good faith with BMWED for a general wage increase.

## II.  **Motion to Dismiss**

### A. Legal Standards

The instant motion to dismiss is brought under both Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6).

In opposing a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of establishing that the Court has jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). If the defendant mounts a "sufficiency challenge", the court will assess the sufficiency of the plaintiff's jurisdictional allegations by construing the complaint liberally, treating all

well-pled facts as true and drawing all reasonable inferences in the plaintiff's favor. <u>Valentin</u> v. <u>Hospital Bella Vista</u>, 254 F.3d 358, 363 (1st Cir. 2001).

If, however, the defendant advances a "factual challenge" by controverting the accuracy, rather than the sufficiency, of the alleged jurisdictional facts, "the plaintiff's jurisdictional averments are entitled to no presumptive weight" and the court will consider the allegations by both parties and resolve the factual disputes. <u>Id.</u> The court has "broad authority" in conducting the inquiry and can, in its discretion, consider extrinsic evidence in determining its own jurisdiction. <u>Id.</u> at 363-64.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the subject pleading must contain sufficient factual matter to state a claim for relief that is actionable as a matter of law and "plausible on its face." <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 (2007)).  A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can draw the reasonable inference that the defendant is liable for the misconduct alleged. <u>Ocasio-Hernandez</u> v. <u>Fortuno-Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011).

When rendering that determination, a court may consider certain categories of documents extrinsic to the complaint "without converting a motion to dismiss into a motion for summary judgment." Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013) (citing Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).  For instance, a court may consider documents of undisputed authenticity, official public records, documents central to a plaintiff's claim and documents that were sufficiently referred to in the complaint. Watterson, 987 F.2d at 3.

A court may not disregard properly pled factual allegations in the complaint even if actual proof of those facts is improbable. Ocasio-Hernandez, 640 F.3d at 12.  Rather, the court's inquiry must focus on the reasonableness of the inference of liability that the plaintiff is asking the court to draw. Id. at 13.

**B. Analysis**

For both requested remedies, Keolis seeks dismissal based on jurisdiction under Rule 12(b)(1) and adequacy of the complaint under Rule 12(b)(6).

### 1. Informational Remedy

### a. Subject-Matter Jurisdiction

Keolis asserts that this Court lacks subject-matter jurisdiction to construe the Award to require it to provide BMWED with sufficient information to compare the economic value of the MOA to subsequent agreements with other unions. It contends that the plain language of the Award does not provide instructions as to what information, if any, Keolis is to provide and thus, imposing such a remedy would require this Court impermissibly to interpret the Award's scope.

Under the Railway Labor Act, arbitration agreements between carriers and their employees must

> provide that any difference arising as to the meaning, or the application of the provisions, of an award made by a board of arbitration shall be referred back for a ruling to the same board, or, by agreement, to a subcommittee of such board.

45 U.S.C. § 158(m). When an attempt to "enforce" an award unveils a dispute that requires interpretation of the scope or application of the award, "that dispute must be referred to a reconvened board of arbitration for determination." Airline Pilots Ass'n Int'l v. Pan Am. Airways Corp., 405 F.3d 25, 33 (1st Cir. 2005) (quoting W. Air Lines, Inc. v. Labor Comm'r of Div. of Labor Law Enforcement, 167 F.2d 566, 567 (9th Cir.

1948)) (internal quotations omitted).  However, this Court retains jurisdiction to enforce the plain meaning of an award.

In <u>Airline Pilots Ass'n Int'l</u>, the First Circuit Court of Appeals clarified the circumstances under which interpretative ambiguities in an award deprive a federal court of jurisdiction. There, the Court reviewed an award where an arbitrator reduced an employee's discharge to a 90-day suspension and provided that the employee "shall be reimbursed [sic] to service with retention of seniority and other benefits" following his suspension. <u>Id.</u> at 32 (internal quotations omitted).

The parties agreed that the terms of the award necessarily implied that the employee would be entitled to backpay.  They disputed, however, whether the award included backpay for the 9-month period during which the employee would have been furloughed had he not been discharged. <u>Id.</u>  The award did not mention backpay at all and thus, gave no indication as to how to treat the furlough period. <u>Id.</u>  As a result, there was a "legitimate question" as to how the award should be interpreted, alternative interpretations of the award were "sufficiently plausible" and the district court lacked jurisdiction to interpret the award. <u>Id.</u> at 32-33.

Here, the Award is clear that Keolis must provide sufficient information to enable the parties to compare the economic value of the "contract terms commencing July 1, 2016

through June 30, 2022" with that of the subsequent agreements and discuss the comparative values with BMWED.  Before analyzing the specific Award language invoking the exchange of information, it is important to review the Award's construction of the Me-Too provision.  The Award is clear that if the economic value of subsequent agreements is <u>less than or equal to</u> that of the MOA, Keolis must "extend" the general wage increase in the subsequent agreement but also provide offsets to ensure the new proposal is not more lucrative than the MOA.  If the economic value of the subsequent agreement is <u>greater than</u> that of the MOA, BMWED is

> entitled to a general wage increase equal to the additional value, if any, of [that] subsequent agreement.

The Me-Too provision in the Award provides that, before a new agreement is proposed, the economic value of the MOA and the subsequent agreements must be compared.  For the parties to determine economic value, the Award imposes a duty on Keolis that it "shall" provide BMWED with an "opportunity to review the option accepting the general wage increase provided in the subsequent agreements in a manner" that addresses costs as it relates to the economic value of the MOA.  In essence, Keolis must give BMWED a chance to review new proposals with sufficient information related to the economic values or "costs" of the MOA

in comparison with the subsequent agreements and to discuss the relative values accordingly.

The summary on the final page of the Award emphasizes that negotiations with respect to proposals are

> <u>contingent</u> upon a review of the economic value of the MOA when compared to a subsequent agreement as described in the Findings and Award

(Emphasis added). The provision of information needed to assess the relative economic values of the MOA and subsequent agreements is a condition precedent to complying with the terms of the Award. Keolis is the only party that has access to such information and to its new agreements with three other unions. Furthermore, the plain language of the Award requires the parties to have discussions concerning the comparative economic values of the MOA and subsequent agreements. Such discussions would be impossible without the underlying information and data concerning economic values of the agreements.

Unlike the parties in <u>Airline Pilots Ass'n Int'l</u>, Keolis does not supply a "sufficiently plausible" alternative interpretation so as to deprive this Court of jurisdiction. The plain terms of the Award require that BMWED has sufficient information to compare the economic values of the agreements and thus, the "opportunity to review the option of accepting the general wage increases" as it relates to the relative values of the agreements.

- 10 -

That the Award did not expressly order Keolis to provide "sufficient information" is not relevant.  In Airline Pilots Ass'n Int'l, the parties agreed that the award required at least some back pay even though it did not specifically refer to the phrase "back pay."  Rather, the award of backpay was unmistakably implied by the finding that the employee was improperly discharged.  Similarly, the plain terms of the Award here require an exchange of comparative economic information is as a prerequisite to a "discussion" about the relative economic values of the agreements and the necessity of negotiating wage increases.  Defendant's 12(b)(1) motion with respect to the informational remedy will be denied.

### b. Merits

Keolis asserts that it extended to BMWED the "opportunity to review the option of accepting a general wage increase" in a manner that accounts for the relative economic values of the MOA and the subsequent agreements.  It also contends that the union could not establish that a subsequent agreement was of greater economic value than the MOA.  BMWED retorts that Keolis has taken the position that it need not provide pertinent information on economic value and has, accordingly, refused to provide such information.

As an initial matter, nothing in the Award suggests that BMWED bears the exclusive burden of demonstrating that the

subsequent agreements have greater economic value than the MOA. The Award requires Keolis to provide sufficient information to enable an assessment of the relative economic value of the MOA and subsequent agreements.   There is conflicting evidence as to whether Keolis has complied with that requirement.

Keolis purports to have provided data in its January 31, 2022 letter that demonstrate the comparative economic value of the MOA and the subsequent agreement reached with the ATDA. That data, according to Keolis, shows that the MOA is more costly than the subsequent ATDA agreement by $260,000.  BMWED, however, suggests that such data compares only the MOA to Keolis's new proposal "but not [to] the economic value of the other unions' agreements."

The current record leaves this Court ambivalent and, in any event, all factual inferences must be drawn in favor of the plaintiff on a Rule 12(b)(6) motion.  In addition, the record presented is insufficient to determine whether proper "discussion[s]" took place concerning the comparative economic values of the MOA and subsequent agreements as required by the Award.  Accordingly, Keolis' 12(b)(6) motion with respect to whether it has sufficiently provided information to BMWED and has properly engaged in discussions with BMWED concerning the comparative economic values of the MOA and subsequent agreements will be denied.

### 2. Bargaining Remedy

Keolis also contends that this Court lacks jurisdiction to interpret the Award to require Keolis to negotiate a general wage increase if such an increase would exceed the economic value of the existing MOA.

The Award states that Keolis

> must extend to the Organization an opportunity to negotiate a general wage increase contingent upon a review of the economic value of the MOA when compared to a subsequent agreement.

In essence, Keolis' duty to "negotiate" is contingent upon an initial comparison of the economic value of the MOA with that of the subsequent agreements as discussed, <u>supra</u>.  Accordingly, while there is no jurisdictional bar to this Court construing the plain language of the Award, whether Keolis has fulfilled its duty to negotiate is not yet ascertainable.  The record is simply insufficient to show whether Keolis has fulfilled its predicate duties of providing BMWED with sufficient information to assess comparative economic values and discussing those values.  The Court agrees with defendant however, that if the parties determine that the MOA is of greater economic value than the subsequent agreements, Keolis has no duty to negotiate a general wage increase that would result in an agreement of greater economic value than that of the existing MOA.

**ORDER**

For the foregoing reasons, the motion of defendant, Keolis Commuter Services, LLC

1) to dismiss for want of jurisdiction under Fed. R. Civ. P. 12(b)(1) (Docket No. 15) is **DENIED;**

2) To dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) (Docket No. 15) is:

    a. with respect to whether Keolis has fulfilled its duties to discuss and provide sufficient information concerning the relative economic values of the Memorandum of Agreement ("MOA") and subsequent agreements, **DENIED;**

    b. with respect to whether Keolis has fulfilled its duty to negotiate a general wage increase contingent upon a review of the economic value of the MOA when compared to the subsequent agreements, **DENIED;** but

    c. insofar as BMWED seeks to impose a duty on Keolis to negotiate a general wage increase if 1) it is determined that the MOA has greater economic value than the subsequent agreements and 2) such an increase would be greater than the economic value of the existing MOA, **ALLOWED.**

**So ordered.**

                                      /s/ Nathaniel M. Gorton
                                        Nathaniel M. Gorton
                                        United States District Judge

Dated:  November 20, 2023